DISTRICT COURT OF APPEAL OF THE STATE OF FLORIDA
FOURTH DISTRICT

**STATE OF FLORIDA,**
Appellant,

v.

**LEWIS STOUFFER, JOSEPH BUFFALINO, JEFFREY REITER, ROGER GORDON, COURTLAND TWYMAN, JEFFREY CLARK THOMSON, BRUCE KARLIN, CRAIG TURTURO, DALE ANDREW GATLIN, BRUCE KAMMERMAN, MICHAEL BENGALA,** and **SONJAY TRIVEDI,**
Appellees.

Nos. 4D2024-0546, 4D2024-0548, 4D2024-0550, 4D2024-0551, 4D2024-0552, 4D2024-0553, 4D2024-0554, 4D2024-0557, 4D2024-0559, 4D2024-0561, 4D2024-0562, 4D2024-0563

[February 18, 2026]

Consolidated appeals from the Circuit Court for the Nineteenth Judicial Circuit, Indian River County; Robert B. Meadows, Judge; L.T. Case Nos. 312012CF000882A, 312012CF000882B, 312012CF000882C, 312012CF000882D, 312012CF000882E, 312012CF000882F, 312012CF000882G, 312012CF000882J, 312012CF000882K, 312012CF000882L, 312012CF000882M, 312012CF000882N.

James Uthmeier, Attorney General, and Kimberly T. Acuña, Assistant Attorney General, West Palm Beach, for appellant.

Daniel Eisinger, Public Defender, and Logan T. Mohs, Assistant Public Defender, West Palm Beach, for appellees Jeffrey Reiter and Roger Gordon.

Antony Ryan, Regional Counsel, and Danielle Forté, Office of Criminal Conflict and Civil Regional Counsel, West Palm Beach, for appellee Joseph Buffalino.

Tama Kudman of Kudman Trachten Aloe Posner LLP, Palm Beach Gardens, for appellee Courtland Twyman.

Daniel Aaronson of Benjamin, Aaronson, & Patanzo, P.A., Fort Lauderdale, for appellee Jeffrey Clark Thomson.

Bernard Cassidy of Lubell & Rosen, Fort Lauderdale, for appellee Bruce Karlin.

David Weinstein of Jones Walker LLP, Miami, for appellee Craig Turturo.

Shannon Day and Jesse Dreicer of Tassone Dreicer & Hill, Jacksonville, for appellee Dale Andrew Gatlin.

Lance Richard of Lance P. Richard, Stuart, for appellee Bruce Kammerman.

Michael Bengala, Pompano Beach, pro se.

Matthew Kachergus of Sheppard, White, Kachergus & DeMaggio P.A., Jacksonville, for appellee Sonjay Trivedi.

LEVINE, J.

The state appeals the trial court's order granting the defendants' motion to dismiss for "constitutional" speedy trial violations. We find that, when applying the four factors of *Barker v. Wingo*, 407 U.S. 514 (1972), the defendants were not deprived of their right to a speedy trial under the United States Constitution and the Florida Constitution. Specifically, as to the second *Barker* factor—the reason for delay—the trial court erred when it based its dismissal on the state's alleged failure to comply with the requirements of *Brady v. Maryland*, 373 U.S. 83 (1963). Competent substantial evidence does not support the trial court's determination that the state failed to comply with discovery and further its obligations under *Brady*. Thus, we find that the trial court erred in granting the motion to dismiss, and, as such, we reverse the dismissal and remand to reinstate the charges and for further proceedings.

### *Facts*

The case started in 2012 when the state filed a 114-count criminal information against fourteen defendants. The information included charges of racketeering, conspiracy, delivery of a controlled substance, illegally prescribing a controlled substance by a practitioner, manslaughter, worker's compensation fraud, money laundering, and drug trafficking. The charges included allegations that the defendants were involved in a statewide "pill mill" operation that dispensed prescriptions for controlled substances without medical necessity, such as oxycodone and other types of opioids. As a result of these numerous charges, the

2

defendants filed multiple motions to compel discovery. In response, the state filed forty supplemental discovery disclosures. Throughout the prosecution, the state listed 535 witnesses and provided voluminous documents.

During the proceedings, the defense sought materials related to (1) the federal investigation of Detective Dilks, who signed a wiretap affidavit in this case, (2) the state's civil lawsuit against pharmaceutical companies ("Big Pharma") alleging fraud that caused opioid misuse, (3) information relating to a confidential informant, and (4) the patient file for the alleged manslaughter victim. The trial court ultimately found that the state's delays in producing these materials, especially those relating to Dilks and Big Pharma, gave rise to a constitutional speedy trial violation and dismissed the case.

I.  Detective Dilks

In October 2014, the defense moved for specific *Brady* material[1] requesting confirmation that Detective Dilks, who signed a wiretap affidavit in this case, was the target of an FBI criminal investigation. That investigation was unrelated to the instant case. In October 2014, the state responded that no *Brady* material existed. However, during a hearing the same month, the state represented that information related to Dilks could be disclosed after resolution of the investigation.

In August 2018, after the apparent conclusion of the investigation, the defense filed a renewed motion for specific *Brady* material regarding the Dilks investigation, representing that the state had advised it was not in possession of any reports. The trial court granted the motion and ordered the state to retrieve all reports related to the Dilks investigation from any state or federal law enforcement agency. The trial court ordered the state to provide *Brady* material to the defense, with disputed materials to be provided to the court for an in camera examination.

In November 2018, the state filed an amended notice of discovery, listing "Brady Material" and "Dilks Interviews." In December 2018, the parties and the trial court entered an agreed "gag" order regarding the production of alleged *Brady* material. The agreed gag order prohibited the defense from copying the documents or using the documents in motions without court permission. At the conclusion of the case, the documents

---

[1] *Brady* material is information favorable to the defense, either exculpatory or impeaching, that is within the state's possession or control. *Dailey v. State*, 283 So. 3d 782, 789 (Fla. 2019).

were "to be returned to the Federal Agency who provided it."

In February 2019, the defense filed a motion for relief from the gag order. In April 2019, the defense filed a motion for complete *Brady* disclosure, detailing items that appeared to be missing from the *Brady* materials provided by the state. The same month, the state responded that Dilks had not been charged with any crime and that the requested items did not exist, were not in its possession, or were not *Brady* material.

During a hearing in April 2019, the state represented it was waiting for federal agents to comply with its requests for some of the materials. The state had brought other materials for the court to review in camera because the state believed the items were not *Brady* material. Thus, two sets of documents were at issue: one provided to the defense and subject to the gag order and a second set provided to the trial court for in camera review. At a December 2020 status hearing, the trial court stated the in camera materials were discoverable and it would issue an order permitting disclosure. In July 2023, the trial court issued an order requiring the in camera documents to be disseminated to the defense. In response, in August 2023, the state produced three DEA reports.

During a hearing in September 2023, the trial court stated that the gag order could now be lifted. The defense indicated that additional relevant material was still missing. The state again responded that the items were not in the state's possession, no charges were filed against Dilks, and the state had met its *Brady* obligations.

During an October 2023 hearing, the trial court stated the defense was entitled to all Dilks investigation material. At the hearing, the trial court acknowledged "there have been oversights by the Court causing delay . . . ." In December 2023, the trial court issued an order granting the defense's motion for *Brady* disclosure compliance, directing that the state produce specific documents. Three days later, in response to the trial court's order, the state filed an amended discovery response, providing a list of additional witnesses and reports.

II. "Big Pharma"

In June 2018, the defense moved for specific *Brady* materials, seeking "copies of the documents in its possession which support the allegations made in the civil suit" filed by the Office of the Attorney General against twenty pharmaceutical companies ("Big Pharma") in May 2018 in Pasco

County.[2]  That lawsuit claimed Big Pharma engaged in a deliberate effort to mislead doctors regarding the safety of opioid therapy and employed medical professionals "to endorse and promote the use of opioids."  The Big Pharma litigation did not involve the defendants in the instant case. Nevertheless, the defendants claimed documentary evidence from Big Pharma would be potentially exculpatory for the defense.

During a hearing in November 2018, the state argued that the documents were not *Brady* material because the Big Pharma complaint had nothing to do with the present case.  In December 2018, the trial court entered a written order granting, in part, the defense's motion for specific *Brady* material.  The order directed the state to "review the materials relied upon by the OAG [Office of Attorney General] in filing their complaint and provide any *Brady* material to the Defendants on or before January 10, 2019."  In February 2019, the state responded that it was not in possession of any *Brady* material.  The state maintained that, based on "conversations with the attorney working on the civil litigation, the material in that case is not <u>Brady</u> in our case."

Thereafter, the defendants continued to seek *Brady* material relating to Big Pharma, and the state continued to maintain no *Brady* material existed.  At a November 2023 hearing, the trial court stated it had previously ruled in 2018 that the documents were *Brady* material and needed to be turned over.

During a January 2024 hearing, the trial court heard testimony from another attorney, whose private firm worked as outside counsel for the state, in the Big Pharma opioid litigation.  That attorney testified that the case resulted in a "$3.1 or $3.2 billion" judgment for the state, following settlements.  According to outside counsel, a lot of the voluminous discovery went to "damages or mitigation damages or the abatement plan," which had nothing to do with the instant case.  The state reiterated that the Big Pharma documents were not *Brady* material.  The trial court responded that it had previously ruled the information was *Brady* material.

III. Additional Discovery

In March 2014, the defense filed a motion for further discovery, seeking reports and medical records regarding the efforts of a confidential informant ("CI") to seek treatment at one of the clinics.  In June 2018, the defense filed another motion for disclosure and production of the CI.  The

_____

[2] *See State v. Purdue Pharma L.P.*, No. 2018-CA-00138 (Fla. 6th Cir. Ct.).

motion stated that the CI went to one of the clinics in an attempt to obtain controlled substance prescriptions, but was turned away initially because of an issue with an MRI and later because she failed the clinic's drug test by testing positive for cocaine. In July 2018, the defense filed an amended motion for disclosure and production of the CI. In August 2018, the state filed an amended notice of discovery identifying the CI's name and listing the CI as a witness.

In February 2019, the defense filed a motion seeking an order directing the state to provide the CI files from the Indian River County Sheriff's Office and the DEA. At a hearing in April 2019, the state reported that the CI file from the sheriff's office was destroyed. The trial court ordered the state to produce the DEA file within thirty days. In May 2019, the state filed an amended notice of discovery providing the CI's undercover file as well as the CI's "Information Letter," "Agreement," and "Criminal History."

Further, in December 2012, the state filed an amended notice of discovery, disclosing the autopsy report and death investigation report of the victim named in the manslaughter count. In October 2013 and June 2016, the state provided multiple patient files to the defense, but did not provide the victim's file. During a November 2023 hearing on a motion to dismiss the manslaughter count, the defense alleged that the victim intended to commit suicide and that, if the medical examiner had had this information, "he would have looked more into it." The defense further argued that the standard of care was impossible to prove because the medical record no longer existed. In January 2024, the state produced the victim's medical records.

IV. Motion to Dismiss

In December 2023, the defense filed a motion to dismiss based on constitutional speedy trial violations, alleging that the state had refused to produce *Brady* materials concerning Dilks for over eight years. The defense further alleged it was prejudiced because the CI had died, the sheriff's office had destroyed the CI's file, and three other witnesses were unavailable, including the medical examiner. According to the defense, the CI's testimony would have refuted Dilks's wiretap affidavit, wherein he stated that the CI could not get into a pain clinic because she did not have a sponsor. The defense claimed the CI would have testified that the real reason was because she tested positive for cocaine.

During the hearing on the motion to dismiss, the defense also argued that the state failed to produce Big Pharma *Brady* material. At the hearing, the defense conceded there was no delay from 2012 to October 2014. The

defense also admitted that a predecessor judge "sat on the case for three years and virtually did nothing."

The trial court granted the defendants' motion to dismiss for "constitutional" speedy trial violations. The trial court determined that the state, through the gag order, had effectively prevented the defendants from using discovery regarding an investigation of Detective Dilks, requested by the defendants as *Brady* material. The trial court also found that the state failed to provide any of the 215 million pages of discovery that were part of the Big Pharma litigation. The trial court stated, and based its ruling on the premise, that "not a single page of the Specific *Brady* requested by the Defense [regarding Big Pharma], has been turned over by the State." Finally, the trial court found that the state failed to produce the CI's file and that it took the state nearly twelve years to produce the patient file for the alleged manslaughter victim. The trial court evaluated the four factors set forth in *Barker*, found that all four factors weighed heavily against the state, and dismissed the information.

## *Analysis*

The trial court determined that the state's violation of the defendants' constitutional speedy trial rights was due to the state's alleged violation of the defendants' right to discovery and *Brady*. The trial court based its decision mainly on the state's alleged delay in producing information relating to Detective Dilks as well as the state's failure to produce information from a civil suit by the state against Big Pharma. We find that neither of these silos of information, whether related to Dilks or Big Pharma, constituted violations of *Brady* and cannot be relied upon when considering the merits of the defendants' claim of a violation of constitutional speedy trial.[3]

---

[3] The issue presented below and now on appeal is the validity of any *Brady* violation, which was the basis of the dismissal for constitutional speedy trial violations. *Brady* violations are generally raised after a trial has already occurred. *See State v. Gillespie*, 227 So. 2d 550, 558 (Fla. 2d DCA 1969) (noting that *Brady* was "cast in the post-trial setting"). "*Brady* is not a discovery rule, but a rule of fairness and minimum prosecutorial obligation." *United States v. Beasley*, 576 F. 2d 626, 630 (5th Cir. 1978) (citing *State v. Agurs*, 427 U.S. 97, 107 (1976)). Finally, *Brady* "is not a pretrial remedy." *United States v. Scott*, 524 F. 2d 465, 467 (5th Cir. 1975). It is important to note that no party on appeal raises the issue of discovery violations in the context of *Richardson*. *See Richardson v. State*, 247 So. 2d 296 (Fla. 1971); *Snelgrove v. State*, 921 So. 2d 560, 567 (Fla. 2005) ("*Richardson* mandates that once a discovery violation is revealed, the trial court must conduct an inquiry to determine the sanctions that should be imposed on the violating party.").

We review "whether a defendant's constitutional right to a speedy trial has been violated" as a "mixed question of law and fact." *Niles v. State*, 120 So. 3d 658, 663 (Fla. 1st DCA 2013). We defer to "the trial court's factual findings that are supported by competent, substantial evidence, while reviewing the court's ultimate legal conclusions de novo." *Id.* The same standard of review applies in reviewing a *Brady* claim. *See Sheppard v. State*, 338 So. 3d 803, 827-28 (Fla. 2022) (stating that a mixed standard of review applies to *Brady* claims; factual findings are reviewed for competent substantial evidence, and legal conclusions are reviewed de novo).

"To establish a *Brady* violation, the defendant has the burden to show '(1) that favorable evidence, either exculpatory or impeaching, (2) was willfully or inadvertently suppressed by the State, and (3) because the evidence was material, the defendant was prejudiced.'" *Dailey*, 283 So. 3d at 789 (quoting *Taylor v. State*, 62 So. 3d 1101, 1114 (Fla. 2011)). "To meet the materiality prong, the defendant must demonstrate a reasonable probability that, had the suppressed evidence been disclosed, the jury would have reached a different verdict." *Id.*

The Sixth Amendment to the United States Constitution and article 1, section 16 of the Florida Constitution guarantee criminal defendants the right to "a speedy and public trial." The Sixth Amendment right to speedy trial applies to the states through the Fourteenth Amendment. *Klopfer v. North Carolina*, 386 U.S. 213, 222-23 (1967). Further, section 918.015, Florida Statutes, also guarantees criminal defendants "the right to a speedy trial."[4]

In the seminal case of *Barker v. Wingo*, 407 U.S. 514, 530 (1972), the United States Supreme Court articulated four factors in determining whether a criminal defendant has been deprived of his right to constitutional speedy trial. The court is to look at the "[l]ength of delay, the reason for the delay, the defendant's assertion of his right, and prejudice to the defendant." *Id.* The "balancing test necessarily compels courts to approach speedy trial cases on an ad hoc basis." *Id.* All of these

---

[4] Effective July 1, 2025, the Florida Supreme Court amended the speedy trial rule. *In re Amends. to Fla. Rule of Crim. Proc. 3.191*, 411 So. 3d 385 (Fla. 2025). The speedy trial rule now starts from the date formal charges are filed rather than from the date of arrest. *Id.* at 386. Dismissals under this rule will be without prejudice unless a defendant's constitutional right to speedy trial has been violated, which would then require a dismissal with prejudice. *Id.*

factors "are related factors and must be considered together with such other circumstances as may be relevant." *Id.* at 533. *Barker* concluded that the "only possible remedy" for a constitutional speedy trial violation is dismissal of all charges with prejudice. *Id.* at 522.[5] Thus, the trial court in the instant case dismissed all counts in the information.[6]

## I. Length of Delay

The length of the delay is the first factor in *Barker* to consider. "[T]he length of delay that will provoke such an inquiry is necessarily dependent upon the peculiar circumstances of the case." *Id.* at 530-31. A longer delay can be justified for serious, complex charges. *Id.* at 531. However, delays approaching one year are generally deemed "presumptively prejudicial." *Doggett v. United States*, 505 U.S. 647, 652 n.1 (1992). However, "'[p]resumptively prejudicial' is not the same as 'conclusively prejudicial.'" *Szembruch v. State*, 910 So. 2d 372, 377 (Fla. 5th DCA 2005) (finding no violation of constitutional speedy trial where both parties were partially responsible for the eleven-year delay in bringing the defendant to trial). Here, the delay from the filing of the information in June 2012 until the hearing on the motion to dismiss in January 2024 is a sufficient time of delay to consider the delay "presumptively prejudicial and require an inquiry." *Id.* at 375. Once the delay is considered presumptively prejudicial, then it becomes necessary to consider the other *Barker* factors.

## II. Reason for Delay

The second factor to consider in *Barker* is the reason for the delay. If the delay of trial is "deliberate" to "hamper the defense," then this factor

---

[5] Dismissal as the only possible remedy has drawn criticism from constitutional scholars. "The Framers' remedial system for constitutional wrongs was based solidly on punitive damages, not exclusions as the 'only possible remedy.' Until speedy trial discourse takes account of all this, glib judicial pronouncements about dismissal should not command the respect of thoughtful students of the Constitution." Akhil Reed Amar, *Sixth Amendment First Principles*, 84 Geo. L.J. 641, 677 (1996).

[6] Although dismissal is "the only possible remedy" for violation of constitutional speedy trial, *see Strunk v. United States*, 412 U.S. 434, 439-40 (quoting *Barker,* 407 U.S. at 522), even if the trial court had viewed this case through the lens of discovery violations, dismissal would still be considered "an extreme sanction and, therefore, should be used with caution, and only when a lesser sanction would not achieve the desired result." *State v. Lamm*, 945 So. 2d 647, 649 (Fla. 4th DCA 2007) (emphasis, citation, and internal quotation marks omitted); *see also* Fla. R. Crim. P. 3.220(n)(1).

would weigh heavily against the state. *Barker*, 407 U.S. at 531. Negligence or overcrowded courts are weighed less heavily as being a more neutral reason. *Id.* Valid reasons such as missing witnesses or a complex case can justify a delay. *State v. Bonamy*, 409 So. 2d 518, 520 (Fla. 5th DCA 1982). Pretrial delay is "both inevitable and wholly justifiable." *Doggett*, 505 U.S. at 656. For example, the prosecution "may need time to . . . oppose [the accused's] pretrial motions." *Id.*

The trial court in its dismissal order found that "[t]he State was the primary reason for the delay, as they continuously failed to abide by their discovery obligations." The trial court's order relied mainly on the delays related to Dilks and Big Pharma, as well as delays related to a confidential informant and the alleged manslaughter victim. The state responds that much of the delay was related to the state's successful interlocutory appeal of an adverse suppression motion, the period of time that passed when the trial court was to conduct an in camera review of materials and issue a ruling, and finally the years that the defense requested *Brady* materials related to Dilks and Big Pharma.

We find that the trial court erred in finding that the state failed to comply with its discovery obligations and specifically its obligations under *Brady*. The delay was due, in part, to the lengthy discovery in a complex case which involved 114 counts against fourteen defendants. In response to numerous discovery requests, the state provided at least forty discovery responses and a witness list of 535 witnesses. A delay can be justified where it is "principally attributable to a lengthy discovery process necessitated by the nature of the investigation and the breadth of [the defendant's] discovery requests." *United States v. Muhtorov*, 20 F.4th 558, 639 (10th Cir. 2021); *see also United States v. Johnson*, 990 F.3d 661, 670 (8th Cir. 2021) ("[T]he heavy discovery in this case mitigates the delay's length."). The record does not contain competent substantial evidence to support the trial court's finding that the reason for the delay was primarily due to the state's failure to comply with its discovery and *Brady* obligations as to Dilks and Big Pharma and, to a lesser extent, the confidential informant and the alleged manslaughter victim.

A. Detective Dilks

The trial court found that the state's failure to provide materials relating to Detective Dilks was one of the primary reasons for the delay and that the state, through a gag order, effectively prevented the defense from using any of this information for five years. The trial court's findings are not supported by competent substantial evidence. Dilks signed the affidavit for the wiretap order in this case. At the same time, unrelated to the

10

present case, the FBI investigated Dilks and concluded the case without any charges. In October 2014, the defense sought *Brady* material regarding the investigation of Dilks, and the state responded that there was no *Brady* material. Following an August 2018 order, the state filed *Brady* materials regarding Dilks in November 2018. Although these materials were subject to a gag order, the gag order was agreed to by the defense and the trial court. *See Pagan v. State*, 29 So. 3d 938, 957 (Fla. 2009) (stating that a defendant cannot complain about a decision he specifically agreed to). Additionally, the trial court removed the gag order following the defense's request. Although the trial court did not lift the gag order until September 2023—four-and-a-half years after the defendants' request—the delay in issuing an order was attributable to the trial court.

In April 2019, the state provided additional documents to the trial court for an in camera review, as permitted by the August 2018 order. In December 2020, the trial court stated that the in camera materials were discoverable and that it would issue an order permitting disclosure. However, the trial court did not issue an order directing the state to provide the in camera documents to the defense until July 2023, over four years after the state provided the documents to the trial court for review. Thus, the delay again was due to the trial court. Indeed, the trial court during a hearing in October 2023 acknowledged "oversights by the Court causing delay." Following the July 2023 order, the state produced the documents in August 2023. Because the state was not the primary reason for the delay, this factor does not weigh against the state.

Additionally, the Dilks investigation was not *Brady* material because it was not in the state's possession until the federal investigation had concluded, and the federal agency provided the state with access to that information. Under *Brady*, the state is required "to disclose material information *within its possession or control* that is favorable to the defense." *Dailey*, 283 So. 3d at 789 (emphasis added) (citation omitted). "The State is charged with constructive knowledge and possession of evidence withheld by other *state* agents, including law enforcement officers." *Jones v. State*, 709 So. 2d 512, 520 (Fla. 1998) (emphasis added). The trial court cannot compel the state to produce records from a federal agency that are not within the state's custody or control. *See Barron v. State*, 990 So. 2d 1098 (Fla. 3d DCA 2007) (finding the trial court properly denied a motion to compel the state to produce DEA investigative files).

Because the state did not possess the Dilks investigative materials, initially they would not qualify as *Brady* material. Thus, there was no legal basis to require production of those documents. Therefore, the trial court could not dismiss the case based on any alleged delay by the state in

producing the Dilks documents.  *See State v. McCutcheon*, 495 So. 2d 931, 931 (Fla. 4th DCA 1986) (reversing dismissal of the information based on an alleged *Brady* violation where no *Brady* violation was shown because the videotape at issue was never in the state's possession); *State v. Rodriguez*, 483 So. 2d 751, 751 (Fla. 3d DCA 1986) (reversing dismissal of the information where the state did not have an obligation to produce witnesses for deposition, and consequently, there was no discovery violation); *State v. Carter*, 29 So. 3d 1217, 1219 (Fla. 2d DCA 2010) (reversing dismissal of the information based on the state's failure to comply with a court order to produce the CI, where there was no legal basis to require production of the CI).  Later, when the federal investigation was completed, the Dilks documents were initially produced, in part, through an agreed upon gag order, and then more fully after the trial court's review of the documents, and finally after the trial court directed the state to produce specific additional documents.

## B. Big Pharma

In May 2018, six years after the present criminal case commenced, the state filed a civil lawsuit against Big Pharma, claiming that the pharmaceutical companies engaged in an effort to mislead about the safety of opioid drugs.  That case was eventually settled.  None of the defendants from this criminal case were involved in any way in the civil litigation.  The defendants sought any *Brady* materials concerning the Big Pharma litigation, specifically "copies of the documents in its possession which support the allegations made in the civil suit."  The trial court entered an order in December 2018, which directed the state to "review the materials relied upon by the OAG in filing their complaint and provide any *Brady* material to the Defendants."  In February 2019, the state responded that it was not in possession of any *Brady* material, based on its conversation with an attorney directly involved in the Big Pharma litigation.

Following the state's response, the defendants continuously requested *Brady* material, and the state repeatedly reiterated that it had no *Brady* material.  Only in November 2023 did the trial court now state that it had ruled in 2018 that all the documents were, in fact, *Brady* material and needed to be turned over.  In January 2024, the trial court heard testimony from outside counsel in the Big Pharma litigation who, once again, represented that there were no *Brady* materials in the Big Pharma litigation.  The dismissal order found that the December 2018 order required the state to produce 215 million pages of discovery documents in the Big Pharma lawsuit and that, despite having over five years, the state failed to produce a single page.

The trial court misconstrued the original order that required the state to determine if there was *Brady* material that the state relied upon when filing the Big Pharma complaint in 2018 and provide any *Brady* material to the defendants. The state responded that there was no *Brady* material. Thus, the state complied with the trial court's order of December 2018. It is important to note that order was not a general discovery order, nor did it involve a larger span of time. It was merely an order to center on the period of time when the state filed its Big Pharma complaint, and for the state to provide *Brady* material as it related to what the state relied on when filing the original complaint in 2018.

*Brady* material is not a general discovery order. *Brady* has a specific meaning. *Brady* material is exculpatory material or material that can be used for impeachment. *Brady* requires the state to "disclose material information within its possession or control that is favorable to the defense." *Dailey*, 283 So. 3d at 789. "To establish a *Brady* violation, the defendant has the burden to show '(1) that favorable evidence, either exculpatory or impeaching, (2) was willfully or inadvertently suppressed by the State, and (3) because the evidence was material, the defendant was prejudiced.'" *Id.* (citation omitted). Further, "[u]nless defense counsel becomes aware that other exculpatory evidence was withheld and brings it to the court's attention, the prosecutor's decision on disclosure is final." *Pennsylvania v. Ritchie*, 480 U.S. 39, 59 (1987) (footnote omitted). The trial court misconstrued the order from 2018, believing that it required the state to provide all materials from the Big Pharma case. The trial court cannot "authorize a 'fishing expedition' . . . on the mere chance that the prosecution [m]ay be derelict in" its duty to disclose. *Gillespie*, 227 So. 2d at 555-56. Further, since the trial court did not review the materials, it could not have determined that these materials constituted *Brady* material. The trial court could have ordered an in camera inspection of Big Pharma materials "if it is demonstrated to him that facts or circumstances exist which support the inference that the mandate of *Brady* is being violated." *Id.* at 560.

Additionally, the defendants failed to show how the Big Pharma documents were "material" under *Brady*. "To meet the materiality prong, the defendant must demonstrate a reasonable probability that, had the suppressed evidence been disclosed, the jury would have reached a different verdict." *Dailey*, 283 So. 3d at 789. "[A] 'reasonable probability' [is] 'a probability sufficient to undermine confidence in the outcome.'" *Id.* (quoting *United States v. Bagley*, 473 U.S. 667, 682 (1985)); *see also United States v. Agurs*, 427 U.S. 97, 112 (1976) (stating the standard of materiality for undisclosed evidence is "if the omitted evidence creates a

reasonable doubt that did not otherwise exist").[7]

Further, the materials being litigated under the designation of Big Pharma could have been accessible by the defense. Although there was a protective order filed at some time during the pendency of the litigation, the protective order itself has a provision that states: "Nothing in this Protective Order shall abridge the right of any person to seek judicial review or to pursue other appropriate judicial action to seek a modification or amendment of this Protective Order." Thus, if the defendants could have attempted to access these materials, then their failure to do so would not be the fault of the state. Further, the defendants would appear to know the information that the pharmaceutical companies provided to them directly and what the defendants would have relied on. "[T]he defendant's 'personal knowledge' of the evidence claimed to represent a *Brady* violation 'would in and of itself defeat his *Brady* claim, since by definition such evidence would not have been unlawfully 'suppressed' by the State.'" *Jimenez v. State*, 265 So. 3d 462, 479 (Fla. 2018) (quoting *Gorham v. State*, 494 So. 2d 211, 212 n.* (Fla. 1986)).

The record does not support the trial court's finding that the delay was due primarily to the state. Nothing in the record supports the trial court's finding that there were documents in the Big Pharma litigation that constituted *Brady* material. Thus, the record does not support a finding that the delay should be weighed against the state.

C. Additional Discovery

The dismissal order found that the state failed to produce the CI's file. The record does not contain competent substantial evidence supporting this finding. The defense sought the CI file in February 2019. In April 2019, the state reported the CI file from the sheriff's office was destroyed, but that the DEA had a file. The trial court ordered the state to produce the DEA file. The following month, the state provided the CI's undercover file and disclosed additional documents concerning the CI a week-and-a-half later.

The dismissal order also found that it took the state almost twelve years to produce the file of a patient whose death formed the basis for the solitary manslaughter charge out of 114 charges in the information. However, at most, any delay would potentially affect only those defendants charged with manslaughter and would not affect the other defendants. Nor would the delay affect the multitude of other charges.

---

[7] The defendants also failed to show the Dilks records were material under *Brady*.

14

### III. Assertion of Right to Speedy Trial

The third factor in *Barker* is whether the defendant asserted his right to speedy trial. "Failure to assert the right will make it difficult for a defendant to prove that he was denied a speedy trial." *Barker*, 407 U.S. at 532.

The trial court stated that the defense could not demand a speedy trial because the defense had not received the *Brady* material. The trial court erred in finding that the defendants had complied with this *Barker* factor. The trial court reasoned that the defendants could not affirmatively demand a speedy trial because the state was the reason for the delay of the *Brady* materials. But the state was not the reason for the delay, since the state had in fact complied with the *Brady* request for Dilks materials and complied by replying that there were no *Brady* materials in the Big Pharma case. The defendants could have demanded a speedy trial, but they never did. In fact, the defendants had affirmatively waived their right to speedy trial.[8] Thus, this factor would not weigh against the state.

### IV. Prejudice

Finally, the fourth factor in *Barker* is the prejudice to the defendant. In assessing prejudice, the court should consider the following interests: "(i) to prevent oppressive pretrial incarceration; (ii) to minimize anxiety and concern of the accused; and (iii) to limit the possibility that the defense will be impaired." *Id.* Of these interests, the last one is the "most serious . . . because the inability of a defendant adequately to prepare his case skews the fairness of the entire system." *Id.* "Ordinarily, a defendant must show actual prejudice under the fourth *Barker* factor; however, where the first three factors weigh heavily against the State, prejudice is presumed." *Niles*, 120 So. 3d at 666. Significantly, a "defendant who cannot demonstrate how his defense was prejudiced with specificity will not make out a speedy trial claim no matter how great the ensuing delay." *United States v. Howard*, 218 F.3d 556, 564 (6th Cir. 2000) (citing *Doggett*, 505 U.S. at 656).

If the first three *Barker* factors do not weigh heavily against the state,

---

[8] Defendants Kammerman, Trivedi, Thompson, and Gatlin expressly waived their right to speedy trial under the constitution and rule 3.191. Defendants Gordon, Karlin, Twyman, and Bengala generally waived their right to speedy trial. Defendants Buffalino and Turturo waived their right to speedy trial under rule 3.191, and defendant Reiter joined in motions for continuance.

then prejudice against the defendant is not presumed. *See Niles*, 120 So. 3d at 666. In this case, only the length of delay weighs against the state. Thus, the defendants must show actual prejudice. *See id.* The defendants have not met this burden.

The trial court stated that the defendants were prejudiced by the state's "deliberate calculated delays." The trial court found that the state's failure to comply with its discovery obligations impacted the defendants' ability to prepare their defense. But the trial court erred in making these determinations and placing blame for the delay on the state without competent substantial evidence. As stated previously, the trial court erred in finding that the state failed to comply with its *Brady* obligations. Thus, since the state complied with its *Brady* obligations, then the state's actions would not have prejudiced the defendants' ability to prepare for trial.

Additionally, it is undisputed that the investigation against Dilks closed without him being charged with any crime, and the Dilks records were eventually provided. "[A]s long as a defendant possesses *Brady* evidence in time for its effective use, the government has not deprived the defendant of due process of law simply because it did not produce the evidence sooner." *United States v. Coppa*, 267 F.3d 132, 144 (2d Cir. 2001). "There is no *Brady* violation unless there is a reasonable probability that earlier disclosure of the evidence would have produced a different result at trial." *Id.* At this juncture, before the commencement of trial, there is no showing that any exculpatory or impeachment evidence was not provided to the defense, or that its earlier disclosure would have produced a different result. The same is true as to Big Pharma because, as previously noted, the defendants would know the information the pharmaceutical companies provided to them and if the defendants relied on it.

The trial court also found that the delay caused witnesses' memories to fade. However, "[a] defendant must do more than simply allege that memories fade or that evidence may be lost. He must come forth and show that some particular witness that would have been helpful to his case has actually forgotten the facts or that some particular witness that would have been helpful to his case has actually been lost." *Bonamy*, 409 So. 2d at 520. "[V]ague assertions of faded memory, without connecting it to a material fact, are insufficient to constitute actual prejudice." *State v. Jenkins*, 899 So. 2d 1238, 1242 (Fla. 4th DCA 2005). "[A]n accused must offer some explanation of how a missing witness' testimony would be both favorable and material." *Id.* at 1241 (citation omitted). Here, the defense offered no such definitive explanation.

The trial court found that material witnesses had died, including the

medical examiner and a CI. However, these witnesses were not material. "A material witness is one who possesses information 'going to some fact affecting the merits of the cause and about which no other witness might testify.'" *Sardinas v. Lagares*, 805 So. 2d 1024, 1026 (Fla. 3d DCA 2001) (quoting *Wingate v. Mach*, 157 So. 421, 422 (1934)). The medical examiner was not a material witness, as another medical examiner could testify in the original medical examiner's place.[9]

The CI was also not a material witness. The defendants claim that the CI's testimony would have been offered to refute Dilks's affidavit that the CI was turned away from the pain clinic because she did not have a sponsor. Rather, according to the defendants, the CI would have testified that she was turned away because she tested positive for cocaine. Because this drug test was administered by the clinic, the clinic would have this information in its own records and would be able to offer this evidence even without the CI's testimony. Additionally, the trial court simply accepted, without evidence, the defense counsel's assertion that the CI was deceased.

We find that *State v. Joyner*, 460 So. 2d 584 (Fla. 5th DCA 1984), controls. In *Joyner,* the defendant's constitutional right to speedy trial was not violated because the defendant "failed to show actual prejudice resulting from the delay." *Id.* at 585. The defendant's "assertion that his defense was impaired by the intervening death of a potential alibi witness was just that—a mere assertion, lacking in substance or particulars." *Id.* Like in *Joyner*, here the defendants offered nothing more than vague assertions and speculation, which is insufficient to show actual prejudice.

### *Conclusion*

We conclude that the state was not the primary cause of the delay, the defendants did not assert their right to speedy trial, and finally the defendants did not meet their burden of showing actual prejudice. As such, the trial court erred in finding that the defendants' constitutional right to a speedy trial was violated. Thus, we reverse the trial court's ruling and remand to reinstate the charges and for further proceedings.[10]

---

[9] Additionally, the medical examiner's testimony would, at most, impact only the solitary manslaughter charge against two defendants.

[10] The state asks that the further proceedings be before a different judge. However, the state has not pointed to any specific instances of bias or impartiality that would necessitate remanding to a different judge. Thus, we decline the state's request. *See Baker v. State*, 349 So. 3d 443, 445 (Fla. 4th DCA 2022).

17

*Reversed and remanded for further proceedings.*

CIKLIN and SHAW, JJ., concur.

* * *

**Not final until disposition of timely-filed motion for rehearing.**